IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF A CELLULAR PHONE DESCRIBED AS ITEM 1 LOCATED AT A SECURE LOCATION IN THE LYNCHBURG POLICE DEPARTMENT LABELED UNDER CASE NUMBER 2021-011936.** ) ) ) ) ) ) ) ) | **FILED UNDER SEAL** <br><br> Case No. 6:21mj37 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a certain electronic device, more fully described below and in Attachment A, which is currently in law enforcement possession, and the extraction from this device of electronically stored information described more fully herein and in Attachment B.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017. I am also a Detective with the Lynchburg Police Department (Virginia) and have been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office. My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources. These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and

convictions of persons for federal narcotics violations. During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations. I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

3. Based on my training and experience investigating narcotics and the distribution of narcotics, I know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics trafficker to use multiple "smart" phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is as follows:

    a.    Cellular phone marked as Item 1 of Lynchburg Police case number 2021-011936 ("**Target Cell Phone #1**").

## STATEMENT OF PROBABLE CAUSE

6.      The United States, including the Drug Enforcement Administration ("DEA"), is conducting a criminal investigation of Steven HUGHEY, aka UGLY, ("HUGHEY") and others regarding the conspiracy to distribute cocaine in violation of 21 U.S.C. § 846.

7.      On August 25, 2021, a grand jury in the Western District of Virginia returned an indictment charging HUGHEY with a drug distribution crime in case number 6:21-CR-1-15.

8.      Beginning in April 2021, HUGHEY was identified by law enforcement, through multiple Sources of Information, as a distributor of narcotics in Western District of Virginia. These Sources of Information made inculpatory statements about their own involvement as a distributor of narcotics. These Sources of Information are awaiting trial on drug trafficking offenses. These Sources of Information advised that HUGHEY utilized cellular phones to facilitate narcotic transactions. These Sources of Information identified HUGHEY as being supplied with cocaine by other co-conspirators indicted in the 6:21-CR-1 indictment.

9.      Specifically, Co-Conspirator #1 ("CC-1") stated that CC-1 supplied HUGHEY with ounces of cocaine, beginning in August of 2020 (approximately). CC-1 stated that HUGHEY communicated with CC-1 via cellular phone.

10.      In April 2021, law enforcement executed a search warrant on a cellular phone being used by CC-1 to facilitate narcotic transactions. Analysis of the data obtained from CC-1's cellular phone determined that CC-1 had a cellular phone number stored in the device under the name of "UGLY." CC-1 advised law enforcement that "UGLY" is an alias for HUGHEY.

11. Further analysis of that data yielded text message exchanges between CC-1 and the number stored as UGLY. The text message exchanges were found to be between July – September 2020. Those text messages included, but not limited to:

   a. From CC-1 "Sup ugly I got the rest of that for you…"

   b. From CC-1 "It's here on deck"

   c. From UGLY "…Gotta go get da change… I def want it".

   d. From CC-1 "Naw they got 30 but 30 mins then they riding"

   e. From CC-1, screen shot of text message with identified source of supply for CC-1 "It was only 99g left… I don't do bad business… I'm going to take care of it.

   f. From UGLY "Ah bro why niggaz ain't communicating I spent my bread bro".

12. Based on my training and experience and the statements made by CC-1, these messages appear to be communications discussing the distribution of control substances.

13. In June 2021, Co-Conspirator 2 ("CC-2") was arrested on drug trafficking offenses. In August 2021, law enforcement conducted an interview of CC-2. CC-2 advised that CC-1 and CC-2 supplied HUGHEY with distributable amounts of cocaine. Those events transpired in the Western District of Virginia. CC-2 provided details regarding this drug trafficking organization that was corroborated by statements made by CC-1 to law enforcement.

**Identification and Recovery of the Target Cell Phone**

14. On September 9, 2021, law enforcement observed HUGHEY operating a vehicle in Amherst County, Virginia. HUGHEY was wanted by law enforcement on a warrant for failing to report to jail to serve a prison sentence. HUGHEY was taken into custody on that warrant.

During the course of HUGHEY's arrest, a cellular phone (**Target Cell Phone #1**) was observed in sitting on the center console of the vehicle HUGHEY was operating. Law enforcement took possession of that cellular phone.

15. During a post-*Miranda* interview of HUGHEY later that same day, HUGHEY denied ownership of the cellular phone that was seized by law from the vehicle.

16. This affiant secured **Target Cell Phone #1** and secured it at the Lynchburg Police Department, marking it as Item 1 under Lynchburg Police case number 20210011936 for safe keeping.

17. I know from training and experience that drug distributors often use cellular phones to arrange drug deals by using the calling feature, text message feature, or a communication-based application and as set forth above, and as explained above law enforcement has specific information that HUGHEY used a telephone application to discuss the search of residence in which it is believed she stored drugs.  An analysis of call patterns can identify other drug dealers.  Photographs or videos found on cellular telephones often show contraband, or locations where contraband may be found.  Contact numbers stored in cellular telephone(s) may identify other drug distributors or associates.  I know from training and experience that persons who distribute illegal narcotics often use multiple phones to hide evidence of their crimes from law enforcement and often subscribe them in fictitious names.  And here, examining further identifiers on the phones could prove HUGHEY's identity as a source of supply.  All told, significant evidence of criminal activity can be found within cellular telephones found in the possession of a drug dealer.

## TECHNICAL TERMS

18. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *Wireless telephone:* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. *Digital camera:* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an

extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA:* A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet:* A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. *Pager:* A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

19.  Based on my training, experience, and research, I know that the device described in Attachment A has capabilities that allows it to serve as a wireless telephone, phone book, digital camera, digital recorder, GPS Navigation, portable media player, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

21.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is

8

    evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it contains evidence described by the warrant.

  23. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

  24. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the device described in Attachment A, in order to seek the items described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

        *s/Daniel Bailey*
        Daniel Bailey, Task Force Officer

Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this 21st day of October 2021.

*Robert S. Ballou*
_____
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE